FILED

2009 Jun-17  AM 09:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRUCE NELSON,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:08-cv-438-JHH** |
| **AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC.;** | ) | |
| **AMERICAN EXPRESS CENTURION BANK; and** | ) | |
| **EXPERIAN INFORMATION SOLUTIONS,** | ) | |
| **INC.,** | ) | |
| **DEFENDANTS.** | ) | |

## MEMORANDUM OPINION

The court has before it the April 13, 2009 sealed motion (doc. #40) of

defendant Experian Information Solutions, Inc. ("Experian") for summary judgment.[1]

Pursuant to the court's orders of April 17, 2009 (doc. #43) and April 28, 2009 (doc.

#49), the motion was deemed submitted, without oral argument, as of May 21, 2009.

_____

[1] Also pending before this court are: (1) the April 16, 2009 sealed motion (doc. #41) of
defendants American Express Travel Related Services Company, Inc. and American Express
Centurion Bank (referred to hereinafter collectively as "AMEX") for summary judgment; (2) the
April 18, 2009 motion of plaintiff Bruce Nelson to compel discovery from AMEX; and (3) the
May 15, 2009 sealed motion (doc. #55) of AMEX to strike portions of plaintiff's evidentiary
submission.  While those motions (docs. #41, 45, 55) will be considered by separate document(s)
at a later time, much of the factual background for those motions will be set forth in this
memorandum opinion.

## I.   PROCEDURAL HISTORY

Plaintiff Bruce Nelson commenced this action on March 11, 2008 by filing a complaint in this court alleging violation of the Fair Credit Reporting Act ("FCRA") in Count I, defamation, slander, and libel in Count II, and negligence, wantonness, and wilfulness in Count III against four defendants -- American Express Company, TransUnion, LLC, ("Trans Union"),[2] Equifax, Inc., ("Equifax"), and Experian Information Solutions, Inc. ("Experian"). (See generally Compl.) On March 18, 2008 Nelson filed an Amended Complaint (doc. #2) renaming the defendant previously identified as Equifax, Inc. to Equifax Information Services, LLC.  On April 1, 2008, Nelson filed a Second Amended Complaint (doc. #3) claiming that defendant American Express Company breached its contract with Plaintiff regarding the payoff and closure of credit card accounts.

On November 25, 2008, Trans Union was, by pro tanto stipulation, dismissed with prejudice from the case.  (See Docs. #23, 24).  On March 9, 2009, the court granted an unopposed motion for leave to amend the complaint to rename American Express Company, Inc. as American Express Travel Related Services, Inc. and American Express Centurion Bank (hereinafter collectively referred to herein as "AMEX").  (See Docs. #32, 33).  Then, on April 20, 2009, Equifax was, by pro tanto

---

[2] Trans Union LLC ("Trans Union") was incorrectly named in the Complaint as TransUnion, LLC.  (See Docs. # 4, 5, 6).

stipulation, dismissed with prejudice from the case.  (See Docs. #44, 46).  Thus, the remaining defendants in this case are AMEX and Experian.

On April 13, 2009, defendant Experian filed a sealed memorandum of law and evidentiary submission (both contained in the sealed motion for summary judgment) (doc. #40), asserting that there are no genuine issues of material fact regarding any of the claims asserted against Experian and that Experian is entitled to judgment as a matter of law on all claims.  Only that motion (doc. #40) is considered herein.

## II.    STANDARDS FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions

on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

4

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v.

Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III.   RELEVANT UNDISPUTED FACTS[3]

### A.   Nelson's Credit Card Debt

Before the events transpired which made the basis of this lawsuit, Nelson had closed two of his AMEX accounts – the Gold account and the Optima account – and was paying off the balances.  (Nelson Aff. ¶ 11, Exhs. B and C to Nelson Aff.).[4]  In December 2000 (and lasting through March 2004), Nelson elected to work part-time instead of full-time, so he could serve as the primary caretaker for his terminally ill father.  (Nelson Aff. at ¶ 2).  On March 30, 2001, Nelson contacted AMEX to inquire about the possibility of a freeze or waiver of payments on Optima and Gold accounts until a debt management plan could be entered into.   (Nelson Dep. at 121-24). During those conversations, Nelson was informed that no late fees had accrued as of the date of the call, but that the Optima account would be 60 days past due on April 19, 2001 (and thus no freeze or waiver was possible), and the Gold account

---

[3]  If facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

[4]  Nelson has submitted two affidavits in opposition to summary judgment, the first referred to herein as simply "Nelson Aff." and the second referred to herein as "Nelson Supp. Aff.".  Although not the subject of a formal motion to dismiss, Experian contends that attachment M to Nelson's first affidavit is inadmissible hearsay.  (See Doc. #62 at 3-6).  That contention will be considered where relevant infra.

would be 60 days past due on April 14, 2001 (yet that account would be noted as disputed).  (Nelson Dep. at 121-24; Nelson Aff. ¶¶ 6-7).

## B.    The Debt Management Plan

On or about March 31, 2001, Nelson entered into a debt management program with Consumer Credit Counseling Services ("CCCS") of Central Alabama.  (See Compl. ¶ 9; see also Nelson Dep. at 134).  The program was designed so that Nelson could pay off his outstanding debts to his various creditors, and depended on CCCS to negotiate a plan acceptable to the creditors.  (See Doc. #40 at 3; see also Compl. ¶ 9).  Two of the accounts Nelson placed in the program with CCCS were the AMEX accounts – the Optima account,[5] number 3734-951385-32008,[6] and the Gold account,[7] number 3727-647934-51007.[8]  (See Compl. ¶¶ 10, 11; see also Doc. #40 at 3-4, ¶¶ 7,

---

[5] The Optima account was with American Express Centurion Bank.  (See Compl. ¶¶ 10-11, 15; see also Nelson Dep. at 95-98).

[6] This is the account number that appeared on Nelson's statements from AMEX.  (See Doc. #40 at 4, ¶ 8; see also Doc. #40, Exh. T).  However, AMEX referenced a different number, the customer number, when it communicated information about this account to the credit reporting agencies.  (See Doc. #40 at 4, ¶ 8; see also Horst Dep. at 228-229 and Axelrod Decl. ¶ 3).  That customer number for the Optima account was 003353-1370-1338-9353.  (See Horst Dep. at 228-229).

[7] The Gold account was with American Express Travel Related Services Company, Inc.  (See Compl. ¶¶ 10-11, 15; see also Nelson Dep. at 95-98).

[8] The Gold account had two components – a revolving component and an open component, which was required to be paid in full every month.  (See Nelson Dep. at 96).  Each component had its own customer number; the customer number for the revolving component was 003353-1370-1353-6542, and the customer number for the open component was 003353-1370-1333-6542.  (See Axelrod Decl. ¶ 4).

8 and Nelson Dep. at 97-98).  Each of those accounts included provisions regarding

the timeliness of payments as well as credit reporting.  (See Doc. #42, Exh. B at Exhs.

A, C).  Specifically:

> Payment for all charges is due immediately upon receipt of the billing statement we mail to you . . . We may accept late payments, partial payments or any payments marked as being payment in full or as being settlement of any dispute without losing any of our rights under this Agreement or under the law.  If we accept such payments, this does not mean we agree to change this Agreement in any way.
>
> We may consider your Account to be in default at any time you fail to pay us any payment when it is due.[9]
>
> Information concerning your account maybe furnished by us to consumer reporting agencies, banks or other creditors.  If we determine that your account is past due, adverse credit information may appear on your consumer report and the consumer reports of any Additional Cardmembers on your account . . .
>
> As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

(See Doc. #41, Exh. B at Exhs. A, C).[10]

On April 4, 2001, CCCS generated forms for transmission to AMEX requesting

that AMEX agree to accept payment arrangements for both accounts.  (See Compl.

---

[9]  This provision applied to the Optima account only.  (See Doc. #41, Exh. B at Exh. C).

[10]  The above provisions were also incorporated by reference in the Sign &Travel and/or Special Purchase Account Agreement, which is applicable to the portion of Nelson's Gold account that was not a charge card for which the total amount outstanding became due each month, but instead provided for a monthly minimum payment that was a portion of the total outstanding balance.  (See Doc. #41, Exh. B at Exh A).

¶ 10; <u>see</u> <u>also</u> Nelson Dep. at 154-55 and Doc. #42, Exh. G).  On or about April 13, 2001, Risk Management Alternatives[11] accepted, on behalf of AMEX, Nelson's proposal for payment arrangements on the Optima account.[12]  (<u>See</u> Compl. ¶¶ 10, 11; <u>see</u> <u>also</u> Nelson Dep. at 158-63 and Doc. #42, Exh. I).  The terms set the principal balance at $2,761.77 with a pay-off schedule calling for monthly payments of $55.00 each beginning in mid-May.  (<u>See</u> Nelson Dep. at 123; <u>see</u> <u>also</u> Horst Dep. at 87-89). The Risk Management Alternatives Acceptance Form includes the following language:

> On behalf of American Express:
>
> **We accept the payment offered in the following terms only:**
>
> Payments specified in the proposal are posted to the account(s) on a monthly basis.
>
> Payments begin no later than 30 days after the date of this letter.
>
> Interest will continue to accrue on all American Express revolving accounts (Optima, Sign and Travel, and/or Special Purchase Account)[13]

---

[11]  Risk Management Alternatives acted as the agent for AMEX in negotiating the terms of the debt management program agreement.  (<u>See</u> Carey Dep. at 165).

[12]  Nelson contends that, contrary to what he was told on the phone by AMEX representatives a few weeks earlier, as of the date of the Agreement, he was only 30 days past due on the Optima account.  (<u>See</u> Exh. C to Nelson Aff. at February, March, and April 2001 statements.)  He does not contend that he was told that he was 60 days past due on the account. (<u>See</u> Nelson Dep. at 121-24).

[13]  Nelson and his consumer credit counselor contend that American Express agreed to waive accrued interest on both accounts so long as monthly payments were timely made.  (<u>See</u> Horst Aff. ¶ 9; <u>see</u> <u>also</u> Nelson Aff. ¶ 13).  According to plaintiff, this was an agreement that had

A **maximum** fairshare of **12%** will be contributed provided it is deducted from the monthly payment amount.

. . .

American Express reserves the right to add charges to the above named account as permitted by law.

Risk Management Alternatives reserves the right to change any of the above terms, except fairshare, without giving prior written notice to the consumer.

(See Doc. #42, Exh. I).

CCCS proposed a payment plan of $155.00 monthly beginning May 20, 2001 for the AMEX Gold account. (See Doc. #42, Exh. G). But on May 3, 2001, Risk Management Alternatives transmitted notice to CCCS that such proposal for the AMEX Gold account was not accepted because it did not meet AMEX's minimum standards. (See Doc. #42, Exhs. G, J). "[A] minimum payment of $159.99 is an acceptable amount. Please resubmit your proposal within 30 days." (Doc. #42, Exh. J). Nelson contends that he did resubmit such a proposal in May 2001, although there is no copy of such in the record. (See Doc. #41 at 6, ¶ 15, Doc. #52, Exh. 17 to Nelson Dep.; see also Nelson Aff. ¶ 9). Nelson admits that as of early May 2001, he was 60 days past due on the Gold account, but he thought that his payments on that

---

been secured with AMEX by the National Foundation for Credit Counseling ("NFCC"), of which CCCS is a member. (See Horst Aff. ¶ 9, Exh. C).

account had been waived until the agreement was in place.  (See Nelson Aff. ¶ 6; see also Exh. B. to Nelson Aff. at March 2001 Gold card statement).

Nelson was never told by anyone at AMEX that there would be no damage to his credit simply by virtue of the fact that AMEX agreed to the debt management plan.  (See Nelson Dep. at 30-31).  In fact, the agreement that Nelson signed with CCCS acknowledged that his participation in the plan could have an adverse impact on credit reports:

> With respect to my credit history, I understand that my participation in a debt repayment program may change information which is already on my credit report.  If my credit report reflects that I have paid creditors as agreed in the past, a Debt Management Program could have negative impact on a creditworthiness decision by a potential creditor, landlord, or employer in the future.

(See Nelson Dep. at 134; see also Doc. #42, Exh. C).

After AMEX received notice that Nelson had placed the accounts in the CCCS program, AMEX cancelled both as provided in the cardholder agreement.  (See Carey Dep. at 72-74, 81-83).  For the Optima account, pursuant to internal AMEX policy,[14] AMEX assigned October 2000 as the "date of first occurrence," approximately six months prior to the cancellation date.  (See Carey Dep. at 289, 295-96).  AMEX then

---

[14]  This policy works as a benefit for AMEX customers, as it results in any negative reporting being dated to an earlier time so that it will drop off a consumer's credit file sooner (because potentially negative information must appear in a consumer's file for seven years).  (See Carey Dep. at 278).

reported the charge-offs[15] to the credit reporting agencies.  (See Carey Dep. at 192, 279; see also Nelson Aff. ¶ 21 and Horst Aff. ¶ 13).  All three of the major reporting agencies started reporting that negative information.  (See Nelson Aff. ¶ 22; see also Exh. D to Nelson Aff.)

When Nelson noticed that his Optima statements showed the account as delinquent and that fees had been charged as a result, he contacted CCCS to ensure that payments were going out as scheduled.  (See Nelson Aff. ¶ 14).  Nelson was assured that they were; in fact, all of CCCS's payment on the Optima account were made by wire.  (See Nelson Aff. ¶ 14; see also Horst Dep. at 103).

In September 2002, AMEX credited back most of the fees it had charged to Nelson's Optima account as late fees and "overlimit" fees.  (See Nelson Aff. ¶ 15; see also Exh. C to Nelson Aff.)  Then, in July 2005, all of the remaining late fees and overlimit fees were refunded as well.  (See Exh. C to Nelson Aff.).

### C.    Information Communicated to the Credit Reporting Agency

Experian is a consumer reporting agency under the FCRA, 15 U.S.C. §§ 1681, et. seq.  (See Iwanksi Decl. ¶ 3).[16]  As a consumer reporting agency, Experian gathers credit information and makes it available to its customers engaged in credit related

---

[15] A charge off is when the account balance is written off by the creditor.  (See Carey Dep. at 192).

[16] Teresa Iwanski was Experian's corporate representative for the Rule 30(b)(5) and (6) deposition.

transactions.  (See id.).  Experian does not originate or create any credit information and does not decide who should receive credit.  (See id.)  Neither does Experian decide whether or when a particular credit account should be charged off by the creditor.  (See id.)

A consumer can dispute any item of credit information reported by Experian directly to Experian.  (See Iwanski Decl. ¶ 6).  When a consumer does not provide proof with his dispute sufficient to allow Experian to update the consumer's file internally, Experian performs an external investigation by contacting the creditor and asking for a response concerning the accuracy of disputed items.  (See id. at ¶ 7).  Typically, Experian contacts the creditor by sending a dispute form (Automated Consumer Dispute Verification or ACDV), which identifies the consumer, the basis for the dispute, how the creditor is currently reporting the disputed information to Experian, and how the consumer asserts the disputed information should be reported.  (See id.)  In the ACDV, Experian asks the creditor to verify or amend the information reported.  (See id.)  The creditor returns the ACDV to Experian, instructing Experian either to leave the item as is, delete it, or change it.  (See id. at ¶ 8).  Experian then compares the creditor's response to what is contained in Experian's records.  (See id.)  If the creditor's response is logical, Experian makes any appropriate updates or deletions based on the creditor's information.  (See id.)  Finally, Experian sends the

consumer a summary reflecting the investigation results and the disputed item's status.  (See id. at ¶¶ 8, 10).

In November 2005, Nelson met with Doug Horst of CCCS and decided, as pertinent hereto, to dispute the credit reporting on his AMEX Optima account.  (See Nelson Dep. at 104-13).   On or about December 7, 2005, Experian received correspondence from Nelson regarding the AMEX Optima account in the form of a letter.  (See Iwanski Decl. ¶¶ 12-13; see also Horst Dep. at 171-72, 230-33; Nelson Aff. ¶ 23 and Exh. E to Nelson Aff.).  The letter references the Optima customer number that AMEX supplied to Experian, states that the account is part of the debt management plan with CCCS, and requests that the rating be changed from "R9" to "R1."[17]  (See Doc. #40, Exh. G at XPN-Nelson 0876).  Another letter of November 2005 received by Experian was signed by Doug Horst, Nelson's consumer credit counselor, stating that Nelson had completed the program with CCCS and attaching

---

[17] Specifically, the letter says about the Optima account:

> This account was part of a debt management plan with CCCS of Central Alabama. American Express agreed to the repayment plan with CCCS, and per the attached documentation, I had perfect pay history with CCCS and CCCS had perfect pay history with American Express.  In addition, I was current with American Express when the program began (see copy of 2001 credit report).  Third, attached is a copy of a refund check sent to me by American Express.  There is no way they would have sent a refund check if I had not completed the program and paid as agreed.  For these reasons, I am STRONGLY REQUESTING that my rating/pay history status be changed to "R1" from "R9."

certain portions of Nelson's internal file at CCCS.  (See Doc. #40, Exh. G at XPN-

Nelson 0880-83).  Various attachments accompany that letter:

- • A proposal to RMA (Risk Management Alternatives)/National Revenue
  Corp., an agent for AMEX, regarding the AMEX Optima account by
  account number, not the customer number supplied to Experian.  (See
  Doc. #40, Exh. G at XPN-Nelson 0891).

- • A document indicating acceptance by Risk Management Alternatives,
  on behalf of AMEX, of an unidentified payment amount.  (See Doc. #40,
  Exh. G at XPN-Nelson 0893).  It is not clear from the face of the
  document as to the account for which the payment offer was accepted.
  (See Doc. #40, Exh. G at XPN-Nelson 0893).

- • An April 2001 credit report from Trans Union, cutting off the names of
  creditors and failing to include either customer or account numbers
  which match to the numbers applicable to either the Optima or Gold
  accounts.  (See Doc. #40, Exh. G at XPN-Nelson 0896-97).  All
  accounts on that report were current and rated R1.  (See id.)

- • An October 25, 2005 check and a November 17, 2005 statement from
  the Optima account, showing a refund due and paying the refund
  balance.  (See Doc. #40, Exh. G at XPN-Nelson 0898-99).

Experian did not consider the information supplied by Nelson to be sufficient

to conclude that AMEX had not charged off the account, and thus that the account

should be reported as "paid as agreed," so Experian sent a letter to Nelson, dated

December 14, 2005, explaining the investigation process.  (See Iwanski Decl. ¶ 13;

see also Doc. #40, Exh. I).  On the same day, Experian sent an ACDV to AMEX,

notifying the company that Nelson disputed the status of the Optima account, and

including some relevant information –  that the account was part of the CCCS debt

management plan; that AMEX agreed to the repayment plan with CCCS; and that AMEX was paid as agreed.  (See Doc. #40, Exh. J; see also Iwanski Dep. at 174). AMEX returned the ACDV the next day, indicating that the status was a "64," meaning that the account is paid, but it was charged off.  (See Iwanski Dep. at 106-07, 175).  In addition, Nelson's account was listed as delinquent as of 10/1/00, the account balance was listed as 0, amount past due was listed as 0, and the account was listed as closed as of 10/1/00.  (See Doc. #40, Exh. J).

Experian then sent a letter to Nelson, notifying him that the account was updated and that AMEX was reporting a status of "paid, closed/account charged off" and "charge off as of Oct 2000."[18]  (See Iwanski Decl. ¶ 13; see also Doc. #40, Exh. L at XPN-Nelson 0054).  Nelson received that report and letter.  (See Nelson Dep. at 122-23).

On June 13, 2006, Experian received another letter on behalf of Nelson from Doug Horst, disputing various accounts.  (See Iwanski Decl. ¶ 15; see also Doc. #40, Exh. M).  The letter referenced the account numbers, not customer numbers,[19] for two AMEX accounts, and indicated that those two accounts had been current prior to the

---

[18] Experian's computer system is programmed to review ACDV responses from creditors. (See Iwanski Dep. at 153).  If a response is deemed "logical" by Experian's computer system, then the response is entered into the computer system's records without any human review.  (See id.)

[19] Experian had the customer numbers, not the account numbers, for those two accounts. (See Horst Dep. at 245, 248).

beginning of the debt management program in March 2001 and that the full balances of both accounts had been paid in full pursuant to the debt management plan.  (See Doc. #40, Exh. M; see also Horst Dep. at 248).  It gave specific account numbers for two accounts which did not appear within Experian's records, which therefore Experian did investigate.  (See Iwanski Decl. ¶ 15).  Experian responded to the June 13 letter on July 2, 2006, giving the results of its investigation into the accounts listed in the letter, and stating, "[o]ther items disputed are not currently displaying on your personal credit report."  (Doc. #40, Exh. N at XPN-Nelson 0091).  No investigation was made into any AMEX accounts,[20] and the status of those accounts remained unchanged.  (Doc. #40, Exh. N at XPN-Nelson 0091; see also Iwanski Dep. at 171).

On March 14, 2007, Experian received a final letter from Nelson referring to the AMEX Optima account by both account and customer number.  (See Doc. #40, Exh. O at XPN-Nelson 0819).  The letter stated that the account had been paid pursuant to the CCCS debt management plan and as such "is inaccurately reflected in my credit report."  (Doc. #40, Exh. O at XPN-Nelson 0819).  It attached the same documents that were attached to the original November 30, 2005 letter of dispute, along with multiple statements from the AMEX Gold account (which account was not

---

[20] Thus, the only investigation by Experian of either AMEX account was the December 14, 2005 ACDV referenced *infra*.  (See Iwanski Dep. at 175-76).

being disputed).  (See Doc. #40, Exhs. G, M).  Because it did not consider any of the information supplied to be new, Experian classified the dispute as a repeat dispute, and sent Nelson a letter on March 21, 2007 stating that it had "already investigated this information and the credit grantor has verified its accuracy" and advised Nelson to provide any new information if available.  (See Doc. #40, Exh. P).  However, Nelson sent no further information, and Experian had no further contact from Nelson related to the AMEX accounts.  (See Doc. #40, Exh. A at ¶ 16).

Neither the Gold nor the Optima accounts still appear in Nelson's Experian credit file.  (See Iwanski Decl. ¶ 17).

### D.     Alleged Effects of Experian's Reporting on Nelson's Credit

Nelson contends that he suffered the following credit denials or instances where he was forced to accept less favorable financing terms as a result of Experian's conduct:  forced to accept less favorable financing on a Macy's account (see Nelson Dep. at 293-95); forced to accept less favorable financing terms on a Dell account (see id.); forced to accept less favorable financing terms on Chase sponsored Circuit City account (see id. at 296-97); forced to accept less favorable financing terms on Southwest Visa Chase account (see id. at 197); denial of application for a University of Alabama Association Bank of America Mastercard in Spring 2006 (see id. at 290-91, 295); denial of application for a University of Alabama Association Bank of America Mastercard in Spring 2007 (see id. at 190-91, 295); and denial of application

18

for a $150,000 small business loan from Compass Bank in Spring 2005 (see id. at 291-93).

Nelson alleges that as a result of being subjected to less favorable financing terms and denials of credit, he frequently had trouble sleeping at night and experienced weight loss due to lack of appetite. (Nelson Dep. at 307, 348-50). The denials of credit for the University of Alabama cards caused particular emotional distress, Nelson alleges, because those were for VISA cards to be issued on behalf of his alma mater, the University of Alabama, and the University would have received part of the interest and fee income from the use of the cards. (Nelson Aff. ¶ 34). Nelson also alleges that the denial of the small business loan in 2005 prevented him from establishing a Herbalife business, which by now, he believes, would be earning him in excess of $100,000.00 per year.[21] (See Doc. #42, Exh. AA at No.15; see also Nelson Dep. at 322-23).

Nelson has not attempted to qualify for a small business loan for his Herbalife business at any time since the information from AMEX ceased to be reported to the credit reporting agencies in 2007. (See Nelson Dep. at 333-34). Nelson believes that it would be difficult for him to qualify for a small business loan given his history of a low earned income. (See Nelson Dep. at 334-35).

---

[21] As of the date of Nelson's application for the Compass Bank small business loan, he had not filed any dispute with any reporting agency. (See Nelson Dep. at 331-32).

## IV.   APPLICABLE LAW AND SUBSTANTIVE ANALYSIS

### A.     The Fair Credit Reporting Act

In Count I of his Complaint, Nelson alleges that Experian violated the Fair Credit Reporting Act ("FCRA") by issuing erroneous reports of his credit history and by knowingly and willfully refusing to correct reports of Nelson's credit history. (See Compl. ¶¶ 32-33).  Thus, Nelson accuses Experian of violating 15 U.S.C. § 1681e(b) and § 1681i.  (See Doc. #58 at 10-19).

Congress designed the FCRA to meet "the needs of commerce for consumer credit, personnel, insurance, and other information" while also ensuring "the confidentiality, accuracy, relevancy, and proper utilization" of consumer information. 15 U.S.C. § 1681(b).  To that end, the FCRA requires, *inter alia*, that whenever a consumer reporting agency, such as Experian, prepares a consumer report, "it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  When a consumer notifies an agency that he disputes the completeness or accuracy of any item in his file, the Act imposes an additional obligation: the agency must conduct a "reasonable reinvestigation" to determine whether the item is inaccurate and either record the item's status or delete it within 30 days.  15 U.S.C. § 1681i.

### 1.   The Prima Facie Case

To make out a prima facie violation of 15 U.S.C. § 1681e(b), Nelson must present evidence that (1) inaccurate information was included in his credit report, (2) the inaccuracy was due to Experian's failure to follow reasonable procedures to assure the maximum possible accuracy of his credit file, and (3) he suffered injury which was caused by the inclusion of the inaccurate entry.  See Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1154-56 (11th Cir. 1991); see also Ray v. Equifax Info. Servs., LLC, 2009 WL 977313, No. 08-10879 at *5 (11th Cir. Apr. 13, 2009). Should Nelson be unable to show any of those prima facie elements, his claim under 15 U.S.C. § 1681e(b) fails.  See Cahlin, 936 F.2d at 1156.

Similarly, under 15 U.S.C. 1681i(a), Nelson can properly raise a claim only by showing that the disputed credit report contained a factual deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular disputed entry.  See Cahlin, 936 F.2d at 1160.[22]

---

[22] Although Cahlin appears to require an inaccurate report to make out a § 1681i(a) claim, other courts have noted that the statute itself does not seem to explicitly require such a report. See, e.g., Thomas v. Gulf Coast Credit Servs., Inc., 214 F.Supp.2d 1228, 1236 (M.D. Ala. 2002). However, these courts recognize that in the absence of such a report, a plaintiff cannot assert damages and thus has no cause of action.  See id. at 1237.

### a.    The Accuracy of the Credit Report

The first hurdle Nelson must overcome to survive Experian's motion for summary judgment is establishing that the report Experian issued was inaccurate. This he can not do.

Different interpretations of what constitutes an "accurate" credit report have led to the development of two differing judicial perspectives. See Ray, 2009 WL 977313 at *5, n.3.  These are the "technically accurate" approach where a credit reporting agency satisfies its duty if it produces a report containing "factually correct information about a consumer that might nonetheless be misleading or incomplete in some respect," Cahlin, 936 F.2d at 1157 (citing Todd v. Associated Credit Bureau, Inc., 451 F.Supp. 447 (E.D. Pa. 1977), *aff'd mem.*, 578 F.2d 1376 (3d. Cir. 1978)), and the "maximum possible accuracy" approach where a credit reporting agency is unable to prevail on summary judgment if the agency "reported factually correct information that could also be interpreted as being misleading or incomplete." Cahlin, 936 F.2d at 1157 (citing Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 42-45 (D.C. Cir. 1984)).  The Eleventh Circuit has not yet adopted either model.  See Ray, 2009 WL 977313 at *5, n.3.  Yet Nelson, without citing any case law, seems to adhere to the "maximum possible accuracy" approach by basing his argument on the contention that "[t]here is substantial evidence that Plaintiff's American Express Gold and Optima accounts *were never actually charged off or delinquent as reported by*

*American Express* and, in turn, by Experian."  (Doc. #58 at 11-12 (emphasis added);

see also Doc. #40, Exh. Q at No. 13).  All of the facts to which Nelson cites highlight

the fact that while Experian's report may not have been of the maximum accuracy,

it was technically accurate.

This court finds, however, that the "technically accurate" approach most

logically governs the burden faced by Experian in producing credit reports.  The

FCRA requires reporting agencies to adopt procedures that assure "maximum

accuracy" of information in consumer credit reports.  See Heupel v. Trans Union,

LLC, 193 F. Supp.2d 1234, 1240 (N.D. Ala. Feb. 7, 2002).  Requiring that each report

be void of material omission would place too great a burden on credit reporting

agencies and could subject them to liability for omitting information of which they

did not know and had no reason to know.  See id.  Requiring "technical accuracy" in

credit reports best captures the balance Congress struck between consumers' concern

for fair and equitable treatment and reporting agencies' goal of maintaining accurate

and cost-effective credit reporting.  See id.

Unfortunately for Nelson, he has admitted, on more than one occasion, that

AMEX did in fact *actually charge off* both the Gold and the Optima accounts.  (See

Compl. ¶ 16; see also Horst Dep. at 240-42 and Doc. #58 at 11-13).  In his complaint,

Nelson unequivocally states "American Express charged-off the accounts and

assigned Plaintiff an 'R9' credit rating."[23]   (See Compl. ¶ 16; see also Horst Dep. at 240-42).   Nelson has also unequivocally (and correctly) stated that an erroneous report is essential to each of his causes of action asserted against Experian.   (See Compl. ¶¶ 32, 36, 40).   Such judicial admissions are "proof possessing the highest probative value.   Indeed, facts judicially admitted are facts established not only beyond the need to prove them, but beyond the power of evidence to controvert them."   Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 620-21 (11th Cir. 1983) (quoting Hill v. FTC, 124 F.2d 104, 106 (5th Cir. 1941)); see also Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997) ("[P]laintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts" and "judicial efficiency demands that a party not be allowed to controversy what it has already unequivocally told a court by the most formal and considered means possible") (internal quotations marks omitted) and 30B Michael H. Graham, Federal Practice & Procedure § 7026 (interm ed. 2006) ("[U]nequivocal admissions made by counsel during the course of trial are judicial admissions binding on his client" and "may not be controverted at trial or on appeal.").

---

[23]   This admission was adopted and incorporated into every count of the complaint, and into every subsequent amended complaint.   (See Compl. ¶¶ 31, 35, 30; see also Doc. #2 ¶ 2; Doc. #3, ¶ 1; Doc. #32 at 4, ¶ 2).   Moreover, AMEX confirms that it charged off both accounts.   (See Carey Dep. at 279-80).

For the foregoing reasons, Experian's report of the AMEX accounts is accurate within the meaning of 15 U.S.C. §§ 1681e(b) which provides Nelson no basis of relief.

### b.    Reasonable Procedures

Even assuming Nelson had established that Experian had inaccurately reported Nelson's AMEX accounts, his claim under Count I of the complaint would nevertheless fail because the FCRA does not hold Experian strictly liable for all reported inaccuracies (however "inaccuracy" is defined).  See Cahlin, 936 F.2d at 1156.  Experian can escape liability if it establishes that an inaccurate report was generated following reasonable procedures.  See Jackson v. Equifax Info. Servs., LLC, 167 Fed. Appx. 144, 146 (11th Cir. Feb. 14, 2006) (citing Cahlin, 936 F.2d at 1156); see also 15 U.S.C. § 1681e(b).  Stated another way, the FCRA "recognizes the reality of unavoidable mistakes and imposes no liability for inaccuracies when an agency has followed reasonable procedures."  Jordan v. Equifax Info. Servs., LLC, 410 F. Supp.2d 1349, 1357 (N.D. Ga. Jan. 18, 2006) (quoting Jones v. Credit Bureau of Garden City, Inc., 703 F.Supp. 897, 901 (D. Kan. 1988)).  Likewise, under 15

U.S.C. § 1681i(a),[24] liability is only incurred for failing to conduct a reasonable investigation.  The FTC states that:

> [a] consumer reporting agency conducting a reinvestigation must make a good faith effort to determine the accuracy of the disputed item or items.  At a minimum, it must check with the original sources or other reliable sources of the disputed information and inform them of the nature of the consumer's dispute.  In reinvestigating and attempting to

---

[24] § 1681i. Procedure in case of disputed accuracy

  (a) Reinvestigations of disputed information
   (1) Reinvestigation required
    (A) In general
      Subject to subsection (f) of this section, if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

. . . .

    (2) Prompt notice of dispute to furnisher of information
    (A) In general
      Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.
    (B) Provision of other information
      The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer or the reseller after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

> verify a disputed credit transaction, a consumer reporting agency may rely on the accuracy of a creditor's ledger sheets and need not require the creditor to produce documentation such as the actual signed sales slips.

FTC Commentary on the Fair Credit Reporting Act, 55 Fed. Reg. 18823.

The standard of care applicable to Experian's conduct is what a reasonably prudent person would do under the circumstances.  See Davis v. Equifax Info. Servs. LLC, 346 F. Supp.2d 1164 (N.D. Ala. 2004) (citing Thompson v. San Antonio Retail Merchants Assoc., 682 F.2d 509, 513 (5th Cir. 1982)).

Nelson or his credit counselor made, arguably, four complaints to Experian regarding the reporting of the AMEX Optima account and one complaint regarding the AMEX Gold account.[25]  On November 30, 2005 Nelson sent a letter to Experian contesting the reporting of the Optima account, as referenced by the customer number Experian had to reference the account.  (See Nelson Aff. ¶ 23; see also Exh. E to Nelson Aff.).  The nature of that contest was this[26] – Nelson paid off the Optima account with monthly payments of $55.00 pursuant to a debt management agreement, yet the Optima account was being reported by AMEX to be "charged-off."[27]  (See

---

[25] Although the court has outlined the undisputed facts *supra*, the facts relevant to the reasonableness of the investigation will be recounted here for clarity and analysis.

[26] It is clear to the court that Nelson's dispute was not that Experian was inaccurately reporting that the Optima account was charged off, but that AMEX never should have charged it off.  (See Horst Dep. at 247-48).

[27] A "charge off" is defined by industry practice and the law as an account that is over 180 days delinquent.  (See Iwanski Dep. at 29-30).

Nelson Aff. ¶¶ 7-9.)  That negative charge-off rating as to the Optima account was, in turn, being reported by Experian.  (See Nelson Aff. ¶ 22; see also Exh. D to Nelson Aff.).  Nelson's November 30, 2005 letter to Experian challenging the rating of the Optima account included supporting documentation.  (See Exh. E to Nelson Aff.).

Around the same time, Experian received a letter from Doug Horst at CCCS supporting Nelson's contention that Nelson had completed the debt management program at CCCS and attaching various documents from CCCS's internal file on Nelson, including: a copy of the written agreement with AMEX's agent, RMA, showing the *account number (not the customer number Experian had)* of the Optima account; the CCCS ledger showing the dates, amounts, and wire number of every payment made on the Optima account *by account number only* and showing that the Optima account had been paid in full; a copy of a Trans Union credit report showing that all AMEX accounts were current *but not visibly including any account numbers*; and a copy of the November 17, 2005 Optima monthly statement showing the account with a $0.00 balance after the issuance of a $10.74 refund to Nelson.  (See Doc. #40, Exh. G at XPN-Nelson 0878-0900).  *All* documents from CCCS's internal file reflected the actual account number related to Nelson's Optima account *and not* the Optima *customer* number which Experian used to reference that account.  (See Doc. #40, Exh. G at XPN-Nelson 0880-0895).

Experian determined that the letters and documentation provided by Nelson

failed to show that the Optima account had not *actually* been charged off by AMEX

as Experian was reporting.  (See Iwanski Aff. ¶ 13; see also Centanni Aff. ¶¶ 4-6).

Thus, Experian initiated an investigation with AMEX, requesting that AMEX verify

its records as to the reporting of the Optima account.  (See Iwanski Aff. ¶ 13; see also

Centanni Aff. ¶¶ 8-9).  AMEX did so on December 15, 2005, and advised Experian

that the Optima account should be reported as a paid charge-off, code "64".  (See

Iwanski Aff. ¶ 13; see also Iwanski Dep. at 106-07).  Nothing in AMEX's response

made the charge off designation demonstrably false.  (See Doc. #58 at 18).  Nelson's

account was listed as delinquent as of 10/1/00, the account balance was listed as 0,

amount past due was listed as 0, and the account was listed as closed as of 10/1/00.

(See Doc. #40, Exh. J).  Therefore, Experian in turn reported the results of the

investigation to Nelson, and informed Nelson that the information on Experian's

report regarding Nelson's Optima account would be changed from the "A-2" ("Paid")

and "97" ("charge-off") codes to a combined "64".  (See Iwanski Dep. at 106-07).


Experian had no further communication with Nelson or his credit counselor

until approximately six months later, in early June 2006.  On June 8, 2006, Doug

Horst wrote a letter to Experian on Nelson's behalf, disputing the reporting of eleven

accounts, purportedly two of which were AMEX accounts, *referenced by account*

29

number*s*.  (See Doc. #40, Ex. M at XPN-Nelson 0901).  Horst acknowledges that his

reference of the AMEX accounts by account number was in error – Horst was aware,

at the time he wrote the June 2006 letter, that *Experian did not have account numbers*

*for the two AMEX accounts*.  (See Horst Dep. at 248).  On July 2, 2006, in response

to the June 2006 letter, Experian sent Nelson a report of its investigation results.  (See

Doc. #40, Exh. N at XPN-Nelson 0093).   Of the eleven accounts which were

disputed, nine were specifically referenced as having been investigated, none of those

being AMEX accounts.  (See id.)  As to the two AMEX accounts, those were *not*

investigated by Experian because they were "not currently displaying on [Nelson's]

personal credit report."  (See Doc. #40, Exh. N at XPN-Nelson 0091, 0093, 0094).

That is, Experian could not investigate the two AMEX accounts because the

referenced account number *did not appear in Nelson's consumer credit file*.  (See

Iwanski Aff. ¶ 15).

　　　　Experian heard nothing from Nelson or his credit counselor until approximately

nine months later.  On March 14, 2007, Experian received a letter from Nelson

contesting Experian's reporting of *only* the AMEX Optima account.[28]  (See Doc. #40,

Exh. O at XPN-Nelson 0819).  The supporting documentation attached to that letter,

as to the Optima account, was identical to the documentation attached to Nelson's

---

[28]   Now Nelson referred to the Optima account by both account and customer number.
(See Doc. #40, Exh. O at XPN-Nelson 0819).

original dispute letter of December 2005.  (*Compare* Doc. #40, Exh. G with Exh. M).

Accordingly, Experian classified the dispute as a repeat dispute, sent Nelson a letter

explaining that the dispute had already been investigated, and advised Nelson to

provide Experian with new information to substantiate any dispute.  (See Doc. #40,

Exh. P).  Nelson did not contact Experian again.  (See Iwanski Aff. ¶ 16).

    This undisputed evidence indicates that Experian acted reasonably with respect

to Nelson's dispute(s) regarding the AMEX accounts.  When Experian was able to

properly identify the disputed account, it contacted AMEX, notified AMEX as to the

nature of the dispute, and asked AMEX to investigate the information being reported.

AMEX *verified the accuracy of the reported information*.  When Experian was not

able to properly identify the disputed account, it notified Nelson that those contested

accounts could not be investigated.  When Experian was confronted with a repeat

dispute, it encouraged Nelson to submit new information to substantiate such

dispute.[29]

    The court finds these actions reasonable and sufficient under the FCRA.  See

Davis, 346 F. Supp.2d at 1173 (granting summary judgment on § 1681e(b) and §

---

[29] The FCRA explicitly provides that a reporting agency is not required to conduct
another investigation in such a situation.  See 15 U.S.C. § 1681i(a)(3) and FTC Commentary on
the FCRA, 55 Fed. Reg. 18824 (explaining that a consumer reporting agency "is not required to
repeat an investigation that it has previously conducted simply because the consumer reiterates a
dispute about the same item of information, unless the consumer provides additional evidence
that the item is inaccurate or incomplete, or alleges changed circumstances.").

1681i(a) claims because the undisputed facts showed agency's investigation and preparation of report complied with the FCRA as a matter of law). For this separate and additional reason, Nelson's claims against Experian under 15 U.S.C. §§ 1681e(b) and 1681i(a) fail and are due to be dismissed.

### c.   Causation

Finally, even had Nelson prevailed on Count I of his complaint as to the first two elements of the prima facie case, Count I would nevertheless fail on the causation inquiry.[30]   Experian's alleged negligence must have proximately caused Nelson's injury. See Heupel v. Trans Union LLC, 193 F. Supp.2d 1234 (N.D. Ala. 2002) (citing Morris v. Credit Bureau of Cincinnati, Inc., 563 F.Supp. 962, 967 (S.D. Ohio 1983)). The failure to produce evidence of damage resulting from a FCRA violation mandates summary judgment. See Nagle v. Experian Info. Solutions, Inc., 297 F.3d 1305, 1307 (11th Cir. 2002).

As set out in the statement of undisputed facts, *supra*, Nelson claims several aspects of injury allegedly caused by Experian's "false" reports – denial of credit, less favorable credit terms, emotional distress, and the loss of business income. He was allegedly forced to accept less favorable financing terms on several accounts – Macy's (see Nelson Dep. at 293-95), Dell (see id.), Circuit City (as sponsored by

---

[30]   Plaintiff's state law claims also require proof of causation. (See Section IV.B., *infra*).

Chase) (see id. at 296-97), and Southwest Visa (see id. at 197).  He was allegedly denied applications for credit on two occasions – in Spring 2006 for a University of Alabama Association Bank of America Mastercard, (see id. at 290-91, 295), and again in Spring 2007 for the same card (see id. at 190-91, 295).  Finally, Nelson was allegedly denied a small business loan from Compass Bank in Spring 2005 in the amount of $150,000 (see id. at 291-93).  These adverse actions must be linked to Experian before liability can attach.

### i.    Less Favorable Financing Terms

Whenever a potential creditor makes a request to review an individual's credit file, Experian records that inquiry in the consumer file in a section titled "Record of requests for your credit history" and, upon request, in turn provides the fact of each inquiry to the consumer.  (See Iwanski Decl. ¶ 18; see also Doc. #40, Exh. R at XPN-Nelson 0150).  Experian's records reflect that the consumer credit reporting agency did receive an inquiry from Macy's on April 12, 2006.  (See Doc. #40, Exh. R at XPN-Nelson 0150).  However, Nelson admits that he does not know that he got a less favorable rate on that account because of Experian's reporting,[31] and there is no other

---

[31] Nelson admits that no one at Macy's told him that he was not qualifying for a lower interest rate because of his credit rating.  (See Nelson Dep. at 317-18).  In fact, Nelson was told by a Macy's representative that it is not Macy's policy to reduce the interest rate "under any way, fashion, or form, regardless of your performance."  (Id. at 318).

However, Nelson does maintain that when he reactivated that Macy's account, "the interest rate he was charged was much higher and the credit limit much lower than he had previously had on that account before Experian started reporting his accounts as charged off."

evidence in the record to support such a conclusion.  (See Nelson Dep. at 299).  As to the other accounts which Nelson contends he was denied favorable financing on as a result of Experian's "inaccurate" reporting – Dell, Circuit City, and Southwest Visa[32] – none of those companies ever made an inquiry to Experian regarding Nelson's credit rating.  (See Doc. #40, Exh. R at XPN-Nelson 0150).  Moreover, Nelson admits that he does not actually know if he received less favorable rates on those accounts because of Experian's reporting.  (See Nelson Dep. at 299-300, 303-04, 304).

Without "evidence tending to show that [he was] damaged as a result of an allegedly inaccurate credit report" issued by Experian, Nelson's assertion for "less favorable financing" can not withstand summary judgment.  See Davis, 346 F. Supp.2d at 1175 (quoting Cahlin, 936 F.2d at 1160).

## ii.   Denials of Credit

Experian's records indicate that there was no inquiry in Spring 2006 from the Bank of America as to Nelson's credit rating.  (See Doc. #40, Exh. R at XPN-Nelson 0150).  Accordingly, Experian could not have been responsible for that alleged

---

(Doc. #58 at 23).  This testimony is not, without more, sufficient to withstand summary judgment on the causation issue.  See Cahlin, 936 F.2d at 1160-61 .

[32]  Plaintiff's opposition (doc. #58) to Experian's motion for summary judgment only mentions the Macy's account for the contention that he was forced to accept less favorable financing terms.  (See Doc. #58 at 23).

denial.  (See Iwanski Decl. ¶ 18).  However, Experian's records do reflect that the

Bank of America made an inquiry into Nelson's credit in Spring 2007.  (See Doc.

#40, Exh. R at XPN-Nelson 0150).  Nelson himself has no personal knowledge of the

reasons he was denied the card,[33] (see Nelson Dep. at 295-96), but attaches to his

affidavit a letter, purportedly from the Bank of America, which states:

> After careful review, we are unable to approve your request because you
> have current or past delinquency *with one or more of your creditors* and
> you have sufficient balances on your revolving credit lines.  Our credit
> decision was based *in whole or in part* on information obtained in a
> report from Experian . . .

(Exh. M to Nelson Aff.) (emphases added).  While the Bank of America letter is,

strictly speaking, hearsay, it likely could be reduced to admissible form at trial, and

therefore can properly be considered herein on summary judgment.  But unfortunately

for Nelson, the letter does nothing to help him over the causation hurdle.  The letter

clearly states that the Bank of America was concerned with Nelson's delinquency

*with one or more of* Nelson's creditors.  It does not mention AMEX or in any way tie

the denial of credit to Experian's reporting of the disputed AMEX accounts.  In fact,

there were several other potentially negative items on the report that Experian

produced to the Bank of America and Nelson *does not dispute* (and has never

---

[33] Plaintiff's contention that an unnamed bank representative told him the denial of credit
was based on the reporting of the AMEX accounts is, of course, inadmissible hearsay presented
for the truth of the matter asserted.  (See Nelson Dep. at 295).

disputed) those additional negative items.  (See Doc. #40, Exh. R at XPN-Nelson 0142).

Without "evidence tending to show that [he was] damaged as a result of an allegedly inaccurate credit report" issued by Experian, Nelson's assertion for "denial of credit" can not withstand summary judgment.  See Davis, 346 F. Supp.2d at 1175 (quoting Cahlin, 936 F.2d at 1160).

### iii.    Emotional Distress

Nelson admits that his emotional distress damages flow completely from his credit denials at Compass Bank and the University of Alabama Alumni Association Bank of America card.  (See Doc. #40, Exh. Q at No. 16; see also Doc. #58 at 24). Because Nelson can not show that those denials were caused by Experian's reporting of inaccurate information, (see Section IV.A.1.c.ii., *supra*), he can not show that Experian caused any emotional distress.  See Davis, 346 F. Supp.2d at 1175 (quoting Cahlin, 936 F.2d at 1160).

### iv.    Loss of Business Income

Experian's records indicate that there was no inquiry by Compass Bank into Nelson's credit *at any time*.  (See Doc. #40, Exh. R at XPN-Nelson 0150).  Nelson himself admits that he does not know that Compass relied on any Experian report when denying his request for a small business loan to start up a Herbalife franchise. (See Nelson Dep. at 304-07).  Without "evidence tending to show that [he was]

damaged as a result of an allegedly inaccurate credit report" issued by Experian,

Nelson's assertion for "loss of business income" can not withstand summary

judgment.[34]  See Davis, 346 F. Supp.2d at 1175 (quoting Cahlin, 936 F.2d at 1160).

## B.   The State Law Claims

Nelson's state law claims are preempted by 15 U.S.C. § 1681h(e) because he

has no evidence that Experian provided "false information furnished with malice or

willful intent to injure" him.  As discussed below, not only does Nelson have no

evidence of maliciousness or willful intent to injure, (see Jordan v. Equifax Info.

Servs., LLC, 410 F. Supp.2d 1349, 1355 (N.D. Ga. Jan. 18, 2006) ("Because

[plaintiff] has pointed to no evidence supporting an inference that the [defendant]

reported information with malice or willful intent toward him, his state law

defamation and negligence claims are preempted by the FCRA.")), he also has no

evidence of negligence.  Thus, regardless of preemption, Nelson's state law claims

would also fail on the merits.

### 1.   Defamation, Slander, and Libel (Count II)

Nelson contends that Experian, "by issuing erroneous reports of Plaintiff's

credit history as described above, ha[s] defamed, slandered, and libeled Plaintiff."

---

[34] Because the "loss of business income" assertion clearly fails on the causation ground, the court sees no reason to engage in an inquiry as to the speculative nature of Nelson's damages in being unable to capitalize on the Herbalife business or in an inquiry as to whether the FCRA allows for damages on the loss of business opportunity.  (See Doc. #40 at 20-22; see also Doc. #58 at 24-26).

(Compl. ¶ 36).  Further, Nelson contends that Experian, "by knowingly and willfully refusing to correct its report of Plaintiff's credit history as described above, ha[s] demonstrated a willful and/or malicious intent to injure Plaintiff."  (Compl. ¶ 37).

To establish a prima facie case of defamation, Nelson must show that Experian "was at least negligent in publishing a false and defamatory statement to another concerning the plaintiff, which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)."  Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1091 (Ala. 1988).  But when alleged defamation is made "on a privileged occasion or under circumstances and conditions which made it privileged in law," it constitutes a complete defense.  See id. at 1092 (citing Ferdon v. Dickens, 49 So. 888 (1909)). Alabama provides a qualified privilege against defamation claims, whenever "they were . . . spoken or published . . . in the . . . fair and honest prosecution of the rights of the party himself, or the protection of his interests."  Ex parte Blue Cross & Blue Shield of Ala., 773 So.2d 475, 478-70 (Ala. 2000).

Section 1681h(e)[35] is recognized as providing exactly that type of qualified privilege for consumer reporting agencies where there is no evidence of wilfulness. See Heupel, 193 F. Supp.2d at 1242 (citing Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir. 1980), *cert. denied*, 449 U.S. 835 (1980)).  Here, Experian is entitled to judgment as a matter of law on Nelson's defamation claim because there is no evidence that Experian maliciously or wilfully furnished false information with the intent to injure Nelson.  See Heupel, 193 F. Supp.2d at 1242 (citing 15 U.S.C. § 1681h(e)).

First, as discussed thoroughly above, (see Section IV.A.1.a., *supra*), Experian did not include any inaccurate information on Nelson's credit report.  That fact is fatal to Nelson's defamation claim.  But even had Experian included false information, the consumer reporting agency would be entitled to the qualified privilege because no communication was made "in bad faith and with actual malice."  Nelson, 534 So.2d at 1095 (internal quotation marks and citations omitted).  Nelson bears the burden of proving common law actual malice "by adducing evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like."  Id.

---

[35] FCRA § 1681h(e) provides as follows:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer.

This Nelson has utterly failed to do.  (See Doc. #58 at 20-22) (arguing that Experian's reports that AMEX had charged off Nelson's accounts were "demonstrably false;" that Plaintiff made efforts to alert Experian to the falsity of the reports; that Experian's reports were contrary to the meaning of a "charge off;" and that Experian did not conduct an investigation in response to a June 2006 letter).

Experian acted reasonably with respect to Nelson's dispute(s) regarding the AMEX accounts.  (See Section IV.A.1.b., *supra*).  When Experian was able to properly identify the disputed account,[36] it contacted AMEX, notified AMEX as to the nature of the dispute, and asked AMEX to investigate the information being reported.  (See id.)  AMEX *verified the accuracy of the reported information*.  (See id.)  When Experian was not able to properly identify the disputed account, it notified Nelson that those contested accounts could not be investigated.  (See id.)  When Experian was confronted with a repeat dispute, it encouraged Nelson to submit new information to substantiate such dispute.  (See id.)  These are not the actions of a reporting agency acting with wilfulness or actual malice.  Therefore, Experian is entitled to summary judgment on Count II of the complaint.

---

[36] Importantly, Nelson did not assert to Experian that AMEX never charged off the accounts, but only that AMEX was not justified in doing so.  (See Horst Dep. at 244-45) ("[W]e did not show information that American Express had not charged it off.  We showed why it shouldn't have been charged off.").

### 2.    Negligence/Wantonness/Wilfulness (Count III)

Nelson contends that Experian, "negligently, wantonly and/or willfully issued and continued to issue erroneous reports of Plaintiff's credit history as described above." (Compl. ¶ 40).  Further, Nelson contends that Experian, "by knowingly and willfully refusing to correct its report of Plaintiff's credit history as described above, have demonstrated a willful and/or malicious intent to injure Plaintiff." (Compl. ¶ 41).

To establish a prima facie case of negligence, Nelson must establish "duty, breach of duty, cause in fact, proximate or legal cause, and damages." Sessions v. Nonnenamann, 842 So.2d 649, 651 (Ala. 2002).  Liability "will be imposed only when negligence is the proximate cause of the injury; injury must be a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury." Vines v. Plantation Motor Lodge, 336 So.2d 1338, 1339 (Ala. 1976).  That Experian did not include any inaccurate information on Nelson's credit report is obviously fatal to Nelson's negligence/wantonness/willfulness claim. (See discussion Section IV.A.1.a., *supra*). And the claim also clearly fails on the damages inquiry. (See discussion, Section IV.A.1.c., *supra*).  Therefore, Experian is entitled to summary judgment on Count III of the complaint.

### V.    Conclusion

For the reasons asserted above, there being no dispute as to any material fact, the motion (doc. #40) for summary judgment of Defendant Experian Information Solutions, Inc. is due to be granted.  A separate order will be entered dismissing all claims asserted against Experian.

**DONE** this the ___17th___ day of June, 2009.

_James H. Hancock_
SENIOR UNITED STATES DISTRICT JUDGE