FILED
2011 Jul-08  AM 10:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BRUCE NELSON, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:08-cv-438-JHH |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC. and AMERICAN EXPRESS CENTURION BANK; | ) ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OPINION

The court has before it the April 16, 2009 sealed motion (Doc. #41) of Defendants American Express Travel Related Services, Inc. and American Express Centurion Bank (collectively referred to herein as "AMEX") for summary judgment. Also pending before this court are the April 18, 2009 motion of Plaintiff Bruce Nelson to compel discovery from AMEX (Doc. #45) and the May 15, 2009 sealed motion (Doc. #55) of AMEX to strike portions of plaintiff's evidentiary submission. Pursuant to the court's orders of April 17, 2009 (Doc. #43), April 28, 2009 (Doc. #49), December 3, 2010 (Doc. #77), December 28, 2010 (Doc. #80), and January 14,

2011 (Doc. #82), the motions were deemed submitted, without oral argument, as of February 15, 2011.

## I.    PROCEDURAL HISTORY

The procedural history of this case is somewhat complex and bears outlining at some length here.  Plaintiff Bruce Nelson commenced this action on March 11, 2008 by filing a Complaint in this court alleging violation of the Fair Credit Reporting Act ("FCRA")  in Count I, defamation, slander, and libel in Count II, and negligence, wantonness, and wilfulness in Count III against four defendants -- American Express Company, TransUnion, LLC, ("Trans Union"),[1] Equifax, Inc., ("Equifax"), and Experian Information Solutions, Inc. ("Experian").  (*See generally* Compl.)   On March 18, 2008 Nelson filed an Amended Complaint (Doc. #2) renaming the defendant previously identified as Equifax, Inc. to Equifax Information Services, LLC.  On April 1, 2008, Nelson filed a Second Amended Complaint (Doc. #3) adding an allegation that Defendant American Express Company breached its contract with Plaintiff regarding the payoff and closure of credit card accounts.

On November 25, 2008, Trans Union was, by pro tanto stipulation, dismissed with prejudice from the case.  (*See* Docs. #23, 24).  On March 9, 2009, the court

---

[1]  Trans Union LLC ("Trans Union") was incorrectly named in the Complaint as TransUnion, LLC.  (*See* Docs. # 4, 5, 6).

2

granted an unopposed motion for leave to amend the complaint to rename American Express Company, Inc. as American Express Travel Related Services, Inc. and American Express Centurion Bank (hereinafter collectively referred to herein as "AMEX"). (*See* Docs. #32, 33). Then, on April 20, 2009, Equifax was, by pro tanto stipulation, dismissed with prejudice from the case. (*See* Docs. #44, 46).

On April 13, 2009, defendant Experian filed a sealed memorandum of law and evidentiary submission (both contained in a sealed motion for summary judgment) (Doc. #40), asserting that there were no genuine issues of material fact regarding any of the claims asserted against Experian and that Experian was entitled to judgment as a matter of law on all claims. On June 17, 2009, this court entered a Memorandum Opinion (Doc. #63) stating that it would grant Experian's motion for summary judgment and dismiss all claims asserted against Experian. On July 27, 2009, the court entered Final Judgment under Rule 54(b) (Doc. #64) ordering, adjudging, and decreeing that Plaintiff have and recover nothing on his claims against Experian. The court expressly directed that final judgment be entered in favor of Experian under Rule 54(b). After unsuccessfully filing a motion in this court to alter, vacate, or amend the summary judgment (Doc. #68), Plaintiff Nelson appealed the decision in Experian's favor to the Eleventh Circuit (Doc. #70).

3

On November 3, 2010, the Eleventh Circuit issued an unpublished opinion affirming this court's decision granting summary judgment in favor of Experian. In the Experian opinion, this court held that the reporting of Nelson's accounts as "charged off" was accurate as admitted by Nelson himself.[2]  (*See* Doc. #63 at 23) (citing Compl. ¶ 16; Horst Dep. at 240-42; Doc. #58 at 11-13)).  The Eleventh Circuit held that "[i]t was not error for the district court to hold the plaintiff to the admissions he made through his pleadings, and plaintiff's evidence shows at best that American Express should not have charged off the accounts, not that it did not."  As a result, this court properly held that the reporting of Nelson's accounts as charged off was at least technically accurate and could not give rise to a FCRA claim.

On December 3, 2010, the court issued an order (Doc. #77) explaining that it had intentionally refrained from ruling on the remaining pending motions (Docs. #41, 45, 55) pending the decision from the Eleventh Circuit.  The same order (Doc. #77) directed the parties to file additional evidentiary matters or briefs in support of their respective positions.  The parties have now filed those supplemental briefs, and the remaining pending motions (Docs. #41, 45, 55) are ripe for review.

---

[2] In the Experian opinion, this court adopted the "technically accurate" approach for examining Plaintiff's credit reports.  (*See* Doc. #63 at 22-23).  Under this approach, a credit report is considered accurate as long as all of the information contained therein is accurate, even if additional information is omitted which could render the report misleading.  (*See* Doc. #63 at 22).

4

The two pending evidentiary motions, however, do not require much analysis. In his Motion (Doc. #45) to Compel, Plaintiff Nelson alleges that AMEX has failed to fully and completely respond to certain discovery requests.  (*See generally* Doc. #45).  However, the Motion to Compel was not filed until two days after the close of discovery in this case (*see* Docs. #16, 31); perhaps more importantly, the information sought would be futile to Plaintiff's cause of rebutting AMEX's motion for summary judgment.  Therefore, the Motion (Doc. #45) to Compel is **DENIED**.  Similarly, striking certain portions of Plaintiff's evidentiary submission, as heralded by AMEX's Motion (Doc. #55) to Strike, would have no effect on the outcomes reached in this Opinion, therefore it too is **DENIED**.  The pending motion for summary judgment is considered at length herein.

## II.    STANDARDS FOR EVALUATING SUMMARY JUDGMENT[3]

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*

---

[3] Although Fed. R. Civ. P. 56 was amended on December 1, 2010, the pending motion for summary judgment (Doc. #41) was filed in 2009.  Moreover, even with the 2010 amendments, "the standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56 advisory committee's note (2010 Amendments).

5

*v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue

at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick,* 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require

7

evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   RELEVANT UNDISPUTED FACTS[4]

Many of the facts set out below are taken verbatim from the Memorandum Opinion (Doc. #63) entered by the court on June 17, 2009. However, where relevant to the pending motion (Doc. #41), new facts are added as needed.

---

[4] If facts are in dispute, they are stated in the manner most favorable to the plaintiff. *See Fitzpatrick,* 2 F.3d at 1115.

### A.    Nelson's Credit Card Debt

Before the events transpired which made the basis of this lawsuit, Nelson had closed two of his AMEX accounts – the Gold account and the Optima account – and was paying off the balances.  (Nelson Aff. ¶ 11, Exhs. B and C to Nelson Aff.).[5]  In December 2000 (and lasting through March 2004), Nelson elected to work part-time instead of full-time, so he could serve as the primary caretaker for his terminally ill father.  (Nelson Aff. at ¶ 2).  On March 30, 2001, Nelson contacted AMEX to inquire about the possibility of a freeze or waiver of payments on Optima and Gold accounts until a debt management plan could be entered into.  (Nelson Dep. at 121-24).  During those conversations, Nelson was informed that no late fees had accrued as of the date of the call, but that the Optima account would be 60 days past due on April 19, 2001 (and thus no freeze or waiver was possible), and the Gold account would be 60 days past due on April 14, 2001 (yet that account would be noted as disputed).  (Nelson Dep. at 121-24; Nelson Aff. ¶¶ 6-7).

### B.    The Debt Management Plan

On or about March 31, 2001, Nelson entered into a debt management program with Consumer Credit Counseling Services ("CCCS") of Central Alabama.  (*See*

---

[5] Nelson has submitted two affidavits in opposition to summary judgment, the first referred to herein as simply "Nelson Aff." and the second referred to herein as "Nelson Supp. Aff."

Compl. ¶ 9; *see also* Nelson Dep. at 134).  The program was designed so that Nelson

could pay off his outstanding debts to his various creditors, and depended on CCCS

to negotiate a plan acceptable to the creditors.  (*See* Doc. #40 at 3; *see also* Compl.

¶ 9).  Two of the accounts Nelson placed in the program with CCCS were the AMEX

accounts – the Optima account,[6] number 3734-951385-32008,[7] and the Gold account,[8]

number 3727-647934-51007.[9]  (*See* Compl. ¶¶ 10, 11; *see also* Doc. #40 at 3-4, ¶¶ 7,

8 and Nelson Dep. at 97-98.  Each of those accounts included provisions regarding

the timeliness of payments as well as credit reporting.  (*See* Doc. #42, Exh. B at Exhs.

A, C).  Specifically:

> Payment for all charges is due immediately upon receipt of the billing
> statement we mail to you . . . We may accept late payments, partial
> payments or any payments marked as being payment in full or as being

---

[6] The Optima account was with American Express Centurion Bank.  (*See* Compl. ¶¶ 10-11, 15; *see also* Nelson Dep. at 95-98).

[7] This is the account number that appeared on Nelson's statements from AMEX.  (*See* Doc. #40 at 4, ¶ 8; *see also* Doc. #40, Exh. T).  However, AMEX referenced a different number, the customer number, when it communicated information about this account to the credit reporting agencies.  (*See* Doc. #40 at 4, ¶ 8; *see also* Horst Dep. at 228-229 and Axelrod Decl. ¶ 3).  That customer number for the Optima account was 003353-1370-1338-9353.  (*See* Horst Dep. at 228-229).

[8] The Gold account was with American Express Travel Related Services Company, Inc. (*See* Compl. ¶¶ 10-11, 15; *see also* Nelson Dep. at 95-98).

[9] The Gold account had two components – a revolving component and an open component, which was required to be paid in full every month.  (*See* Nelson Dep. at 96).  Each component had its own customer number; the customer number for the revolving component was 003353-1370-1353-6542, and the customer number for the open component was 003353-1370-1333-6542.  (*See* Axelrod Decl. ¶ 4).

settlement of any dispute without losing any of our rights under this Agreement or under the law. If we accept such payments, this does not mean we agree to change this Agreement in any way.

We may consider your Account to be in default at any time you fail to pay us any payment when it is due.[10]

Information concerning your account maybe furnished by us to consumer reporting agencies, banks or other creditors. If we determine that your account is past due, adverse credit information may appear on your consumer report and the consumer reports of any Additional Cardmembers on your account . . .

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

(*See* Doc. #41, Exh. B at Exhs. A, C).[11]

On April 4, 2001, CCCS generated forms for transmission to AMEX requesting that AMEX agree to accept payment arrangements for both accounts. (*See* Compl. ¶ 10; *see also* Nelson Dep. at 154-55 and Doc. #42, Exh. G). On or about April 13, 2001, Risk Management Alternatives[12] accepted, on behalf of AMEX, Nelson's

---

[10] This provision applied to the Optima account only. (*See* Doc. #41, Exh. B at Exh. C).

[11] The above provisions were also incorporated by reference in the Sign &Travel and/or Special Purchase Account Agreement, which is applicable to the portion of Nelson's Gold account that was not a charge card for which the total amount outstanding became due each month, but instead provided for a monthly minimum payment that was a portion of the total outstanding balance. (*See* Doc. #41, Exh. B at Exh A).

[12] Risk Management Alternatives acted as the agent for AMEX in negotiating the terms of the debt management program agreement. (*See* Carey Dep. at 165).

proposal for payment arrangements on the Optima account.[13]  (*See* Compl. ¶¶ 10, 11; *see also* Nelson Dep. at 158-63 and Doc. #42, Exh. I).  The terms set the principal balance at $2,761.77 with a pay-off schedule calling for monthly payments of $55.00 each beginning in mid-May.  (*See* Nelson Dep. at 123; *see also* Horst Dep. at 87-89).  The Risk Management Alternatives Acceptance Form includes the following language:

> On behalf of American Express:
>
> **We accept the payment offered in the following terms only:**
>
> Payments specified in the proposal are posted to the account(s) on a monthly basis.
>
> Payments begin no later than 30 days after the date of this letter.
>
> Interest will continue to accrue on all American Express revolving accounts (Optima, Sign and Travel, and/or Special Purchase Account)[14]
>
> A **maximum** fairshare of **12%** will be contributed provided it is deducted from the monthly payment amount.

---

[13] Nelson contends that, contrary to what he was told on the phone by AMEX representatives a few weeks earlier, as of the date of the Agreement, he was only 30 days past due on the Optima account.  (*See* Exh. C to Nelson Aff. at February, March, and April 2001 statements.)  He does not contend that he was told that he was 60 days past due on the account. (*See* Nelson Dep. at 121-24).

[14] Nelson and his consumer credit counselor contend that American Express agreed to waive accrued interest on both accounts so long as monthly payments were timely made.  (*See* Horst Aff. ¶ 9; *see also* Nelson Aff. ¶ 13).  According to plaintiff, this was an agreement that had been secured with AMEX by the National Foundation for Credit Counseling ("NFCC"), of which CCCS is a member.  (*See* Horst Aff. ¶ 9, Exh. C).

. . .

American Express reserves the right to add charges to the above named account as permitted by law.

Risk Management Alternatives reserves the right to change any of the above terms, except fairshare, without giving prior written notice to the consumer.

(See Doc. #42, Exh. I).

CCCS proposed a payment plan of $155.00 monthly beginning May 20, 2001 for the AMEX Gold account.  (See Doc. #42, Exh. G).  But on May 3, 2001, Risk Management Alternatives transmitted notice to CCCS that such proposal for the AMEX Gold account was not accepted because it did not meet AMEX's minimum standards.  (See Doc. #42, Exhs. G, J).  "[A] minimum payment of $159.99 is an acceptable amount.  Please resubmit your proposal within 30 days." (Doc. #42, Exh. J).  Nelson contends that he did resubmit such a proposal in May 2001, although there is no copy of such in the record.  (See Doc. #41 at 6, ¶ 15, Doc. #52, Exh. 17 to Nelson Dep.; see also Nelson Aff. ¶ 9).  Nelson admits that as of early May 2001, he was 60 days past due on the Gold account, but he thought that his payments on that account had been waived until the agreement was in place.  (See Nelson Aff. ¶ 6; see also Exh. B. to Nelson Aff. at March 2001 Gold card statement).

13

Nelson was never told by anyone at AMEX that there would be no damage to his credit simply by virtue of the fact that AMEX agreed to the debt management plan. (*See* Nelson Dep. at 30-31). In fact, the agreement that Nelson signed with CCCS acknowledged that his participation in the plan could have an adverse impact on credit reports:

> With respect to my credit history, I understand that my participation in a debt repayment program may change information which is already on my credit report. If my credit report reflects that I have paid creditors as agreed in the past, a Debt Management Program could have negative impact on a creditworthiness decision by a potential creditor, landlord, or employer in the future.

(*See* Nelson Dep. at 134; *see also* Doc. #42, Exh. C).

After AMEX received notice that Nelson had placed the accounts in the CCCS program, AMEX cancelled both as provided in the cardholder agreement. (*See* Carey Dep. at 72-74, 81-83). For the Optima account, pursuant to internal AMEX policy,[15] AMEX assigned October 2000 as the "date of first occurrence," approximately six months prior to the cancellation date. (*See* Carey Dep. at 289, 295-96). AMEX then reported the charge-offs[16] to the credit reporting agencies. (*See* Carey Dep. at 192,

---

[15]  This policy works as a benefit for AMEX customers, as it results in any negative reporting being dated to an earlier time so that it will drop off a consumer's credit file sooner (because potentially negative information must appear in a consumer's file for seven years). (*See* Carey Dep. at 278).

[16]  A charge off is when the account balance is written off by the creditor. (*See* Carey Dep. at 192).

279; *see also* Nelson Aff. ¶ 21 and Horst Aff. ¶ 13).  All three of the major reporting agencies started reporting that negative information.  (*See* Nelson Aff. ¶ 22; *see also* Exh. D to Nelson Aff.)

When Nelson noticed that his Optima statements showed the account as delinquent and that fees had been charged off as a result, he contacted CCCS to ensure that payments were going out as scheduled.  (*See* Nelson Aff. ¶ 14).  Nelson was assured that they were; in fact, all of CCCS's payment on the Optima account were made by wire.  (*See* Nelson Aff. ¶ 14; *see also* Horst Dep. at 103).

In September 2002, AMEX credited back most of the fees it had charged to Nelson's Optima account as late fees and "overlimit" fees.  (*See* Nelson Aff. ¶ 15*; see also* Exh. C to Nelson Aff.)  Then, in July 2005, all of the remaining late fees and overlimit fees were refunded as well.  (*See* Exh. C to Nelson Aff.).

## C.    Information Communicated to the Credit Reporting Agencies[17]

In July 2004, Nelson learned that AMEX began listing both the Gold and Optima accounts as "charged off"[18] and all three credit reporting agencies started reporting that negative information.  (*See* Nelson Dep. at 264-74; *see also* Nelson Aff.

---

[17]  An explanation of the facts as related specifically to Experian are set out in this court's previous Memorandum Opinion of June 17, 2009.  The court discusses here facts relevant to credit reporting agencies only as those facts impact the claims brought directly against AMEX.

[18]  A "charge off" is defined by industry practice (and law) as an account that is over 180 days delinquent.  (Iwanski Dep. at 29-30).

¶ 13).  On August 5, 2004, a CCCS representative sent a letter directly to AMEX requesting that R9 charge off designations be changed to R1meaning "paid as agreed." (*See* Nelson Dep. at 269; *see also* Exh. O to Doc. #). According to AMEX policies, it may cancel an account if a customer enters a debt management program, with a charge off occurring only if the principal balance (or a substantial portion of it) is not paid.  (Carey Dep. at 192-193).  Plaintiff and his credit counselor called AMEX many times trying to resolve the dispute.  (Nelson Aff. ¶ 24).

On December 15, 2005, AMEX received an ACDV request from Experian requesting verification of Plaintiff's account information.  (Gordon Dep. at 228). AMEX returned the ACDV the next day, indicating that the status was a "64," meaning that the account is paid, but it was charged off.  (*See* Iwanski Dep. at 106-07, 175).  In addition, Nelson's account was listed as delinquent as of 10/1/00, the account balance was listed as 0, amount past due was listed as 0, and the account was listed as closed as of 10/1/00.  (*See* Doc. #40, Exh. J).

Plaintiff and his CCCS counselor continued calling AMEX trying to resolve the issue. (Nelson Aff. ¶ 28).  Eventually the Gold account was deleted in its entirety, as was the Optima account.  (Nelson Aff. ¶¶ 28, 32).

### D.    Alleged Effects on Nelson's Credit

Nelson contends that he suffered the following credit denials or instances where he was forced to accept less favorable financing terms as a result of AMEX's conduct:  forced to accept less favorable financing on a Macy's account (*see* Nelson Dep. at 293-95); forced to accept less favorable financing terms on a Dell account (*see id.*); forced to accept less favorable financing terms on Chase sponsored Circuit City account (*see id.* at 296-97); forced to accept less favorable financing terms on Southwest Visa Chase account (*see id.* at 197); denial of application for a University of Alabama Association Bank of America Mastercard in Spring 2006 (*see id.* at 290-91, 295); denial of application for a University of Alabama Association Bank of America Mastercard in Spring 2007 (*see id.* at 190-91, 295); and denial of application for a $150,000 small business loan from Compass Bank in Spring 2005 (*see id.* at 291-93).

Nelson alleges that as a result of being subjected to less favorable financing terms and denials of credit, he frequently had trouble sleeping at night and experienced weight loss due to lack of appetite.  (Nelson Dep. at 307, 348-50).  The denials of credit for the University of Alabama cards caused particular emotional distress, Nelson alleges, because those were for VISA cards to be issued on behalf of his alma mater, the University of Alabama, and the University would have received

17

part of the interest and fee income from the use of the cards.  (Nelson Aff. ¶ 34).

Nelson also alleges that the denial of the small business loan in 2005 prevented him

from establishing a Herbalife business, which by now, he believes, would be earning

him in excess of $100,000.00 per year.  (*See* Doc. #42, Exh. AA at No.15; *see also*

Nelson Dep. at 322-23).

Nelson has not attempted to qualify for a small business loan for his Herbalife

business at any time since the information from AMEX ceased to be reported to the

credit reporting agencies in 2007.  (*See* Nelson Dep. at 333-34).  Nelson believes that

it would be difficult for him to qualify for a small business loan given his history of

a low earned income.  (*See* Nelson Dep. at 334-35).

## IV.   APPLICABLE LAW AND SUBSTANTIVE ANALYSIS

As stated by the Plaintiff, "[a]t its core, this case arises from Plaintiff's claims

that AMEX injured him by falsely reporting to the major credit reporting agencies

that two AMEX credit card accounts belonging to Plaintiff had become delinquent

and had been charged off.  As a threshold issue, in order to survive summary

judgment, Plaintiff must show substantial evidence that AMEX is guilty of reporting

false information before inquiry can be made into whether AMEX properly

investigated Plaintiff's dispute over that information."  (Doc. #51 at 19-20).  To that

end, Plaintiff makes six assertions:

(1)     AMEX violated the Fair Credit Reporting Act ("FCRA") by falsely reporting on numerous occasions to all three of the credit reporting agencies that Plaintiff's Gold Card and Optima Account were charged off;

(2)     Plaintiff's state law claims are not preempted by the FCRA because AMEX's persistence in reporting false information about Plaintiff's accounts to the credit reporting agencies is substantial evidence of malice;

(3)     Plaintiff's wantonness and wilfulness claims under Alabama state law are not time-barred because wantonness and wilfulness are subject to a six-year statute of limitations under Alabama law;

(4)     There is substantial evidence to support every element of Plaintiff's defamation claims against AMEX;

(5)     There is substantial evidence that AMEX's false reports caused Plaintiff to be denied credit on at least three occasions, to be offered less favorable finance terms on other occasions, and caused Plaintiff substantial emotional distress;

(6)     Plaintiff's claimed damages for loss of business opportunity are viable under the FCRA because the credit report at issue was related to a non-business credit history.

(*See generally* Doc. #51).  AMEX counters in favor of summary judgment:

(1)     Plaintiff's Fair Credit Reporting Act ("FCRA") claim against AMEX is time-barred pursuant to the two-year statute of limitations of 15 U.S.C. § 1681p insofar as it is based on Plaintiff's December 2005 disputes;

(2)     There is no evidence that AMEX has failed to comply with the requirements of 15 U.S.C. § 1681s-2, which sets forth the duties of furnishers of information to consumer reporting agencies;

19

(3)     Plaintiff's breach of contract claim against AMEX fails because Plaintiff has been unable to identify any contractual provision that AMEX is alleged to have breached.

(4)     Plaintiff's state tort law claims against AMEX are preempted by 15 U.S.C. § 1681h(e) and 15 U.S.C. § 1681t(b)(1)(F);

(5)     Plaintiff's state law claims are barred by the two-year statute of limitations of Ala. Code §§ 6-2-38(k) and 6-2-38 (l) to the extent that they are based upon events that took place prior to March 12, 2006;

(6)     Plaintiff's defamation claim fails because Plaintiff cannot make an evidentiary showing to support each of the elements he is required to prove;

(7)     Plaintiff has no evidence that any action by AMEX caused him to be denied credit or offered financing on less favorable terms or that any action by AMEX caused his alleged emotional distress, all of which Plaintiff attributes to specific credit denials;

(8)     Plaintiff has no evidence of willfulness, wantonness, or actual malice, and Plaintiff's claims for punitive damages against AMEX therefore fail as a matter of law;

(9)     Plaintiff's claimed economic damages are speculative, and therefore the law does not afford Plaintiff a recovery; and

(10)    Plaintiff's claimed damages are not available to Plaintiff under the FCRA because they are business damages.

The arguments for and against summary judgment are considered below.

## A.     The Fair Credit Reporting Act

In Count I of his Complaint, Nelson alleges that AMEX violated the Fair Credit Reporting Act ("FCRA") by issuing erroneous reports of his credit history and by

knowingly and willfully refusing to correct reports of Nelson's credit history.  (*See* Compl. ¶¶ 32-33).  Section 1681s-2(b)(1) of the FCRA outlines a furnisher's duty to investigate:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall –
>
> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly –
>
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

Thus, a furnishers' (such as AMEX) § 1681s-2(b)(1) duty to investigate is not triggered unless and until the furnisher of the information receives notice of the consumer's dispute directly from a credit reporting agency that complies with 15 U.S.C. § 1681i(a)(2).  Communications received by a furnisher directly from the

consumer, rather than from a credit reporting agency, do not trigger any duty on the part of the furnisher of the information. *Woltersdorf v. Pentagon Federal Credit Union*, 320 F.Supp.2d 1222, 1225 n. 5 (N.D. Ala. 2004); *Stafford v. Cross Country Bank*, 262 F.Supp.2d 776, 783-84 (W.D. Ky. 2003). Plaintiff does not dispute this point. (Doc. #51 at 22-23).

### 1.   Information Reported by AMEX was Accurate

AMEX received a triggering dispute notice from Experian on December 14, 2005 and responded to it on December 15, 2005. (*See* Doc. #84 at 11). On December 15, 2005 AMEX advised Experian that the Optima account should be reported as a paid charge-off, code "64". (*See* Iwanski Aff. ¶ 13; *see also* Iwanski Dep. at 106-07). Nothing in AMEX's response made the charge off designation demonstrably false. (*See* Doc. #58 at 18). Nelson's account was listed as delinquent as of 10/1/00, the account balance was listed as 0, amount past due was listed as 0, and the account was listed as closed as of 10/1/00. (*See* Doc. #40, Exh. J). Experian in turn reported the results of the investigation to Nelson, and informed Nelson that the information on Experian's report regarding Nelson's Optima account would be changed from the "A-2" ("Paid") and "97" ("charge-off") codes to a combined "64". (*See* Iwanski Dep. at 106-07). The designation, according to Plaintiff's admission and the Eleventh Circuit opinion, is accurate – AMEX did in fact charge off Plaintiff's accounts, so the

reporting as such was accurate.[19]  (*See* Doc. #63 at 22-24) (citing Compl. ¶ 16; Horst Dep. at 240-42; Doc. #58 at 11-13)).   Therefore, the first hurdle Nelson must overcome to survive AMEX's motion for summary judgment – establishing that the reporting of Nelson's accounts as "charged off" was incorrect or technically inaccurate – he can not surpass.

### 2.   AMEX Conducted a Reasonable Investigation

Even assuming Plaintiff could establish that AMEX reported inaccurate or incomplete information, that fact alone would not subject AMEX to liability under the FCRA.   Furnishers like AMEX are not subject to civil liability under the FCRA for issuing false reports; they are only liable for failing to reasonably investigate a properly submitted credit dispute under § 1681s-2(b).   *See Gorman v. Wolpoff & Abramson, LLP*, 552 F.3d 1008, 1015-16 (9th Cir. 2009).   Whether a defendant's investigation is a reasonable one is a factual dispute normally reserved for trial.

---

[19]  Plaintiff notes, despite the Eleventh Circuit ruling, that he "might have argued that Experian's report was inaccurate because he presented evidence that American Express should not have charged off the accounts even if it did."  (Doc. #84 at 1).  Nelson appears to base this "should not have charged off" argument on two separate sub-arguments: (1) that AMEX violated an industry standard (and established law) by charging off the Accounts before they became 180 days past due; and (2) that AMEX violated its own internal policies by charging off the Accounts before they became 120 days past due.  (Doc. #84 at 6-8).  But AMEX "never reported or confirmed that accounts were 180 days delinquent, as is now being alleged."  (Doc. #85 at 3).  Moreover, to the extent Plaintiff attempts to base his argument for relief under the FCRA on the contention that AMEX agreed to modify Plaintiff's card member agreements, the undisputed evidence on company policy is that an account can be charged off at any time if the cardholder is not paying according to the terms of the Cardmember Agreement or if the cardholder indicates an inability to pay according to the terms of the Cardmember Agreement.  (Gordon Dep. at 257-58).

Plaintiff argues that the only investigation conducted by AMEX consisted of an AMEX employee pulling up AMEX's computer file of Plaintiff's accounts, noting the "charge off" and "delinquency" entries; then, without questioning the information, rubber stamping the previously reported information.  (Doc. #84 at 12).  AMEX argues that the investigation was reasonable as the company "took affirmative action to amend the reported status of Nelson's Optima account to a '64,' meaning that the account had been paid and carried a '0' balance, but was previously charged off." (Doc. #85 at 3).

Indeed the investigation into the ACDV could not be construed as anything less than reasonable.  AMEX confirmed the account as being charged off and indeed the *account was in fact charged off*.  As such, AMEX properly verified the accuracy of the reported information and reasonably responded to the request for review.  No claim for liability against AMEX can stand under this set of facts.

### 3.   Plaintiff's FCRA Claim Against AMEX is Barred by the Statute of Limitations

The statute of limitations provides yet another reason why Plaintiff's FCRA claim against AMEX must fail.  Under  15 U.S.C. § 1681p, an action is timely if filed within two years from the date on which the liability arose or within two years from the plaintiff's discovery of a material and wilful representation on the part of the

defendant.  *Clay v. Equifax, Inc.*, 762 F.2d 952 (11th Cir. 1985).  AMEX's potential for liability is limited to its response to Experian's ACDV on December 15, 2005. Nelson, however, waited until March 12, 2008, more than two years after AMEX had completed its investigation, to commence the present action.  As such, it is time barred.

Nelson tries to get around the statute of limitations issue by arguing a continuing violation, that the false reports continued until July 2007 (*see* Doc. #84 at 15).  However, as previously explained, furnishers of information can only be potentially liable for failing to reasonably investigate a properly submitted credit dispute under § 1681s-2(b).  AMEX therefore cannot be civilly liable under the FCRA for any alleged false reports which continued until 2007, but only for its alleged failure to properly investigate Experian's December 14, 2005 ACDV.  That is, each transmission of the same allegedly inaccurate consumer credit report is a separate and distinct tort to which separate statutes of limitations and investigation requirements under the FCRA.  *See, e.g. Jaramillo v. Experian Information Solutions, Inc.*, 155 F. Supp2d 356, 359 (E.D. Pa. 2001) ("[Plaintiff] concedes that, to the extent that National City received the CDV's prior to November 17, 1998, two years prior to the date his case was filed, his FCRA claim is barred by the statute of

limitations."). For this separate and additional reason, Plaintiff's FCRA claim against AMEX fails.

### 4.    There is no Evidence to Suggest that AMEX's Reports Caused Plaintiff Harm

Even making the giant leap that Nelson's FCRA claim against AMEX could proceed past accuracy, reasonableness, and statute of limitations inquiries, the count would nevertheless fail on the causation inquiry. AMEX's alleged negligence must have proximately caused Nelson some perceptible harm. The failure to produce evidence of damage resulting from a FCRA violation mandates summary judgment. *See Nagle v. Experian Info. Solutions, Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002).

As set out in the statement of undisputed facts, *supra*, Nelson claims several aspects of injury allegedly caused by AMEX's designation of his accounts as "charged off" – denial of credit, less favorable credit terms, emotional distress, and the loss of business income. But in the Memorandum Opinion of June 17, 2009, this court concluded that Nelson's alleged injuries could not be attributed to any false reporting by Experian. (*See* Doc. #63 at 32-37). There are similarly no facts to link Nelson's damages to AMEX's reporting, and Nelson does not argue otherwise. On these facts alone, AMEX is entitled to summary judgment on Nelson's FCRA claim.

### B.    The State Law Claims – Counts II, III, and IV

Defendants argue that the state law claims brought against AMEX are: (1) preempted by the FCRA and (2) incapable of standing because Nelson cannot show that AMEX's reporting of his accounts caused any damages. (*See* Doc. #83 at 14; *see also* Doc. #85 at 6-9). Nelson counters that AMEX's reports to the credit reporting agencies that Plaintiff's accounts were at least 180 days in arrears as of October 2000 were demonstrably false. (See Doc. #84 at 15-16). "Given the efforts made by Plaintiff and CCCS to alert AMEX to the falsity of its reports through every available channel, as well as the fact that the reports violate AMEX's own standards and policies, a jury could reasonably conclude that AMEX persisted in issuing these reports with reckless disregard of their falsity. Such reckless disregard is sufficient to infer malice or a willful intent to injure." (Doc. #84 at 16).

In the Experian order, this court ruled that state law claims are preempted by the FCRA section 1681h(e) absent a showing that false information was furnished with malice or willful intent to injure. (Doc. #63 at 37). "As discussed below, not only does Nelson have no evidence of maliciousness or willful intent to injure, (*see Jordan v. Equifax Info. Servs., LLC*, 410 F.Supp.2d 1349, 1355 (N.D. Ga. Jan. 18, 2006) ("Because [plaintiff] has pointed to no evidence supporting an inference that the [defendant] reported information with malic or willful intent to injure him, his state law defamation and negligence claims are preempted by the FCRA.")), he also

27

has no evidence of negligence.  Thus, regardless of preemption, Nelson's state law claims would also fail on the merits."  (Doc. #63 at 37).  The same holds true for all of the state law claims asserted against AMEX.  Nelson has presented no tangible evidence that AMEX acted with malice or willful intent.  AMEX never reported Nelson's accounts as being 180 days delinquent.  (*See* Doc. #85 at 7).  As such, there is nothing to demonstrate that AMEX acted with "ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like."  (Doc. #63 at 39) (quoting *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1095 (Ala. 1988)). Perhaps more importantly, the reporting of Nelson's accounts as paid and charged off was accurate. AMEX timely investigated and responded to Experian's December 14, 2005 ACDV, and amended its reporting of the accounts as paid and charged off with a "0" balance.

Even if Nelson could somehow prove that his state law claims are not preempted, those claims would nevertheless fail because no evidence has been presented that the actions of AMEX caused Nelson any harm.  (*See generally* discussion *supra* Section III.A.4. and Doc. #63 at 32-37).  Just as there were no facts to link Experian's reporting to Nelson's damages, there is similarly no link to AMEX. (*See* Doc. #63 at 32-37).  For this separate and additional reason, Plaintiff's state law claims against AMEX necessarily fail.

V.     Conclusion

For the reasons asserted above, there being no dispute as to any material fact, the Motion (Doc. #41) for summary judgment of Defendants American Express Travel Related Services, Inc. and American Express Centurion Bank is due to be granted.  A separate order will be entered dismissing all claims asserted against American Express Travel Related Services, Inc. and American Express Centurion Bank.

**DONE** this the ___8th___ day of July, 2011.

SENIOR UNITED STATES DISTRICT JUDGE